594 A.2d 564

**NISSEN CORPORATION et al.**

v.

**Warren G. MILLER, Individually and t/a
Atlantic Fitness Products et al.**

**No. 110 Sept. Term, 1990.**

Court of Appeals of Maryland.

Aug. 27, 1991.

Daniel J. Moore (Thomas M. Trezise, Stephen E. Marshall, Semmes, Bowen & Semmes, all on brief), Towson, for petitioners.

A. Ronald Rubin (Nancy B. Gertner, both on brief), John B. Sinclair (Carol A. O'Day, Kara M. Miller, Miles & Stockbridge, all on brief), Baltimore, for respondents.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and J. WILLIAM HINKEL, Administrative Judge of the Third Judicial Circuit of Maryland Specially Assigned.

CHASANOW, Judge.

On January 31, 1981, Frederick B. Brandt (Brandt) purchased from Atlantic Fitness Products (Atlantic) a treadmill that was designed, manufactured, and marketed by American Tredex Corporation (American Tredex). Later the same year, on July 31, Nissen Corporation (Nissen) entered into an asset purchase agreement with American Tredex. Pursuant to that agreement, Nissen purchased the trade name, patents, inventory and other assets of American Tredex. Nissen also assumed some of American Tredex's obligations and liabilities, but the contract expressly excluded assumption of liability for injuries arising from any product previously sold by American Tredex. The contract contemplated the continuation of the selling corporation, American Tredex, for five years and that during that period American Tredex would be known by a new name, AT Corporation.

There is no reason to believe that this was not an arms length transaction or that American Tredex (later known as AT Corporation) did not receive and retain full value for its assets. While the record does not disclose the purchase price, the contract did call for an advance of $600,000 on its execution. In addition to the purchase price, Nissen agreed to pay to AT Corporation, for a 5–year period, a fee of 4% of net sales of any treadmill models that were offered or under development by American Tredex at the time of the purchase of assets or that were mere adaptations or modifications of those models. This clause also provided that the amount of this payment be a minimum of $100,000 to a maximum of $1,000,000 per year. AT Corporation also

retained all accounts receivable arising from sales shipped prior to the contract inventory date. The contract further provided that "neither [AT Corporation] nor any of its shareholders shall have any right to use any of the trademarks, trade names, designs and symbols theretofore used by [American Tredex] in connection with its business or any trademark or trade names similar thereto or any designs or symbols imitative thereof."

After the sale, although the agreement expressly provided that Nissen was not required to retain American Tredex employees, Nissen did hire a few of American Tredex's former employees. It relocated all inventory and manufacturing capabilities from Indiana to Iowa and notified its dealers of the acquisition. It provided catalogs with a "Tredex by Universal" logo, as well as a new customer service number at Nissen. Nissen also continued to sell replacement parts for equipment that had been sold by American Tredex before the sale of assets.

Over five years after his purchase of the treadmill, on October 18, 1986, Brandt was injured while trying to adjust the running treadmill. More than a year later, on December 31, 1987, American Tredex (then known as AT Corporation) was administratively dissolved. Brandt and his wife filed suit on September 1, 1988, against American Tredex, AT Corporation, Nissen, and Atlantic, seeking damages for negligence, strict liability, breach of express and implied warranties, and loss of consortium. Atlantic cross-claimed against Nissen for indemnity and contribution. Nissen filed a motion for summary judgment, which was granted by the trial court and certified as a final judgment pursuant to Maryland Rule 2–602(b). Brandt and Atlantic appealed to the Court of Special Appeals. In *Miller v. Nissen Corp.*, 83 Md.App. 448, 575 A.2d 758 (1990), the Court of Special Appeals reversed the trial court. We granted Nissen's petition for writ of certiorari on the issue of whether it, as a successor to American Tredex, is liable to Brandt for his injuries.

■ The issue in the instant case is whether this Court should adopt the general rule of nonliability of successor corporations, with its four well-recognized traditional exceptions, or whether we should add a fifth exception for "continuity of enterprise."

The general or traditional rule of corporate successor liability has been stated by many cases and treatises:

"[A] corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor, unless: (1) there is an express or implied agreement to assume the liabilities; (2) the transaction amounts to a consolidation or merger; (3) the successor entity is a mere continuation or reincarnation of the predecessor entity; or (4) the transaction was fraudulent, not made in good faith, or made without sufficient consideration. Thus, the general rule is one of successor nonliability, subject to four 'traditional' exceptions...."
(Footnotes omitted.)

1 *American Law of Products Liability 3d* § 7:1, at 10–12 (Travers, rev. ed. 1990); *accord* 1 L. Frumer & M. Friedman, *Products Liability* § 2.06[2] (1989); 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122, at 231 (rev. perm. ed. 1990).

In *Smith v. Navistar Intern. Transp. Corp.*, 687 F.Supp. 201, *republished as corrected*, 737 F.Supp. 1446 (D.Md. 1988), Judge Niemeyer discussed the application of the general rule of corporate successor liability in Maryland. He observed:

"Some of the exceptions are expressly codified by statute in Maryland. Section 3–115(c) of the Corporations and Associations Article, Maryland Annotated Code, provides that upon the transfer of all or substantially all assets, '[t]he successor is liable for all the debts and obligations of the transferror to the extent provided in the Articles of Transfer.' Section 3–114(e), Corporations and Associations Article, Maryland Annotated Code, provides that following a consolidation or merger '[t]he successor is liable for all debts and obligations of each

nonsurviving corporation.' These two statutes are very similar to the first two exceptions to the traditional rule.... Additionally, the Maryland Uniform Fraudulent Conveyance Act, § 15–201 *et seq.*, Commercial Law Article, Maryland Annotated Code, protects the rights of creditors of a corporation which transfers its assets with an intent to defraud or without fair consideration in a manner similar to the fourth exception noted above."

*Id.* at 204. That logic was applied by the Court of Special Appeals when it decided *Baltimore Luggage v. Holtzman,* 80 Md.App. 282, 562 A.2d 1286 (1989), *cert. denied,* 318 Md. 323, 568 A.2d 28 (1990), a case involving corporate successor liability in a contract law setting. The *Baltimore Luggage* court also discussed the third exception, known as the "mere continuation" or continuity of entity exception, where there is continuity of entity between the successor and the predecessor:

"Although this exception is not codified or adopted in Maryland case law, the policy behind this exception, as well as the other exceptions, permeates the Corps. & Ass'ns and the Com. Law Articles. *See, e.g.,* §§ 3–114 and 3–115 of the Corps. & Ass'ns Art., Md. Uniform Fraudulent Conveyance Act, and the Md. Bulk Transfers Act.... The policy is that, whenever there is a transfer of assets, the rights of a creditor must be protected. The 'mere continuation' [or continuity of entity] exception reinforces this policy by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor. The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a 'new hat.' *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458 (11th Cir.1985). To allow the predecessor to escape liability by merely changing hats would amount to fraud."

*Id.* 80 Md.App. at 296–97, 562 A.2d at 1293. All parties agree that this Court should adopt the general rule of nonliability of a successor corporation, with its four traditional exceptions. Brandt and Atlantic (Respondents) contend we should also adopt the more liberal "continuity of enterprise" theory as a fifth exception in products liability cases.

In products liability litigation, three types of claims are generally involved: negligence, breach of warranty, and strict liability in tort. The negligence count of a products liability claim comports with longstanding common law tort principles. Breach of warranty is a traditional contract action, and strict liability in tort has been developed to remedy the harsh result sometimes imposed where a plaintiff is limited to bringing negligence and breach of warranty claims for injuries caused by a defective and unreasonably dangerous product. *See Phipps v. General Motors Corp.*, 278 Md. 337, 352–53, 363 A.2d 955, 963 (1976). The United States Court of Appeals for the Third Circuit has recognized that "[t]he rationale of the ... continuity of enterprise theor[y] rests in large part on a postulated need to compensate plaintiffs eligible under [*Restatement (Second) of Torts* ] § 402A [ (1965) ] [ (strict liability) ]." *Polius v. Clark Equipment Co.*, 802 F.2d 75, 80 (3rd Cir.1986). Since many of the public policy arguments generally offered to justify imposition of products liability on a corporate successor, and the arguments made in this case, are the same arguments offered to justify adoption of the cause of action for strict liability in tort, this opinion will address the question whether Maryland should adopt the continuity of enterprise theory in the strict liability setting. Obviously, if we reject imposition of liability based on continuity of enterprise in the strict liability count, it follows that we reject it in the negligence and breach of warranty counts as well.

Respondents would only be entitled to recover if we expand the traditional "mere continuation" or continuity of *entity* exception and add the "continuity of *enterprise* "

exception to the general rule of nonliability of corporate successors.[1] The mere continuation or continuity of entity exception applies where "there is a continuation of directors and management, shareholder interest and, in some cases, inadequate consideration. The gravamen of the traditional 'mere continuation' exception is the continuation of the *corporate entity* rather than continuation of the business operation." 1 Frumer & Friedman, *supra,* § 2.06[2][c], at 2-182 to 2-183 (emphasis in original, footnote omitted); *accord* 1 *American Law of Products Liability 3d, supra,* § 7:14, at 30. This exception focuses on the continuation of management and ownership. In contrast, the continuity of *enterprise* theory focuses on continuation of the business operation or enterprise where there is no continuation in ownership. 1 *American Law of Products Liability 3d, supra,* § 7:20, at 36.

Respondents do not contend that Nissen is a "mere continuation" of American Tredex or that the sale of assets in the instant case falls within any of the traditional exceptions to the rule of nonliability of corporate successors, nor would the record support such an argument. Only if we expand the traditional exceptions to include a "continuity of enterprise" exception would Brandt be entitled to proceed against Nissen.

---

**1.** Respondents do not argue, and we need not address, whether we should recognize the product line theory, which has been accepted in California, New Jersey, Pennsylvania and Washington. 1 *American Law of Products Liability 3d* § 7:27, at 44 (Travers, rev. ed. 1990). The continuity of enterprise and product line theories have been distinguished as follows: "[A] continuity of enterprise analysis seeks to establish whether there is substantial continuity of pretransaction and posttransaction *business activities* resulting from the use of the acquired assets, while a product line analysis seeks to establish whether there is a substantial continuity in the *products* resulting from the pretransaction and posttransaction use of the assets" of the predecessor corporation. *Id.* § 7:20, at 37 (emphasis added). The product line theory's "departure from traditional principles has been found too far-reaching and radical by some courts, and the product line exception has been expressly rejected in many jurisdictions." *Id.* § 7:27, at 44 (footnote omitted).

Brandt urges that we adopt the continuity of enterprise theory because it "is limited, proper and pertinent to the rights of a consumer who has suffered a personal injury for which some entity must be held responsible." He argues that "courts have logically prevented the evasion of liability by any part of the manufacturing and selling chain" and that, in recognition of this public policy, we should "not allow a major corporation to purchase only the benefits in an asset purchase transaction while denying its attendant liabilities to the consuming public, particularly where the successor corporation has held itself out to the public as the sponsor of the injury causing entity." Atlantic further argues that the traditional rule evolved to protect the rights of creditors and shareholders in the corporate context and is inapplicable in the case of products liability plaintiffs and that "[a] corporation contemplating not only the acquisition of the assets of another corporation, but also the continuation of the basic enterprise of that corporation must accept the burdens as well as the benefits of such a transaction." Atlantic contends that, because Nissen enjoyed American Tredex's goodwill and held itself out as the effective continuation of American Tredex, selling replacement parts, performing some contracts, retaining some employees, honoring existing 90–day warranties, and servicing customer accounts, it should bear the burden of American Tredex's liability for defective products.

Nissen counters that it was not part of the "manufacturing and selling chain"; it merely purchased American Tredex's assets. That transaction was fully negotiated, including the requirement that the predecessor corporation continue in existence after the sale, presumably so that it would be subject to suit in cases such as this. The price Nissen paid for the business was based on the total contract, including the provision that the predecessor retain all liability for injuries caused by defective products sold by it before the asset purchase. Nissen argues that we should adhere to "[t]he longstanding general rule and its well-defined limited exceptions" because they "have functioned well to

balance the rights of creditors and successor corporations by preserving traditional principles of corporate law and promoting the free alienability of business assets while maintaining adequate protection for the interests of consumers and creditors from fraudulent and unjust corporate transactions." Nissen urges that the expansion of the traditional rule that Respondents propose would impose liability not only upon "a major corporation ... where the successor corporation has held itself out to the public as the sponsor of the injury causing entity," but also upon the small corporation that purchases assets and carries on a business but abandons its predecessor's defective, injury causing designs or practices.

The question of successor corporate liability in a products liability case has not heretofore been addressed by this Court. Interestingly, the issue was analyzed twice in 1988 by two different judges of the United States District Court for the District of Maryland, both applying Maryland law. Judge Niemeyer, on May 24, 1988, predicted Maryland would accept the continuity of enterprise theory. *Smith v. Navistar Intern. Transp. Corp.*, 687 F.Supp. 201, *republished as corrected*, 737 F.Supp. 1446 (D.Md.1988). Judge Smalkin, one week later, predicted we would not. *Giraldi v. Sears, Roebuck & Co.*, 687 F.Supp. 987 (D.Md.1988).

This Court espoused the doctrine of strict liability in tort as set forth in *Restatement (Second) of Torts* § 402A, in *Phipps v. General Motors Corp.*, 278 Md. at 353, 363 A.2d at 963, a case involving a defective automobile accelerator pedal. In that case, we traced the historical development of the tort and noted that "strict liability for defective products ... was imposed without privity or a showing of negligence beyond the defect in the product." *Id.* at 342, 363 A.2d at 957. Respondents argue that public policy demands that we accept the continuity of enterprise doctrine because, as stated by Brandt in his brief, "some entity must be held responsible" where "a consumer ... has suffered a personal injury." In *Phipps*, however, we clarified the basis for our adoption of strict products liability:

"[T]he theory of strict liability is not a radical departure from traditional tort concepts. Despite the use of the term 'strict liability' the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product. Proof of a defect in the product at the time it leaves the control of the seller implies *fault* on the part of the seller sufficient to justify imposing liability for injuries caused by the product." (Emphasis added, citation omitted.)

*Id.* at 351–52, 363 A.2d at 963. Thus, in adopting the cause of action for strict liability in tort, this Court has not abandoned the fundamental concept of fault.

We adopted the theory of strict liability in tort to foreclose the unfair result "where injured parties are forced to comply with the *proof requirements* of negligence actions or are confronted with the *procedural requirements* and limitations of warranty actions." *Id.* at 353, 363 A.2d at 963 (emphasis added). This rationale is echoed in our cases since *Phipps.* In *Harig v. Johns–Manville Products,* 284 Md. 70, 394 A.2d 299 (1978), we stated, "the theory of strict liability does not mark a 'radical departure' from established tort concepts. Rather, 'the major distinction between an action in strict liability in tort and one founded on traditional negligence theory relates to the *proof* which must be presented by the plaintiff.' " *Id.* at 83–84, 394 A.2d at 306–07 (quoting *Phipps,* 278 Md. at 350–51, 363 A.2d at 962) (emphasis added). In *Miles Laboratories v. Doe,* 315 Md. 704, 556 A.2d 1107 (1989), Chief Judge Murphy, writing for the Court, again stated the policy underlying strict products liability in Maryland:

"The theory of strict liability, we said in *Phipps,* was not a radical departure from traditional tort concepts, even though the plaintiff in such an action need not prove any specific act of negligence on the part of the seller. What is required is proof of a defect existing in the product at the time it leaves the seller's control. Under strict liability principles, the seller is not an insurer, as absolute liability is not imposed on the seller for any

injury resulting from the use of his product. Rather, '*[p]roof* of a defect in the product at the time it leaves the control of the seller *implies fault* on the part of the seller sufficient to justify imposing liability for injuries caused by the product.' " (Emphasis added, citations omitted.) *Id.* at 717, 556 A.2d at 1113 (quoting *Phipps*, 278 Md. at 351–52, 363 A.2d at 963).

It is clear that Maryland espoused the doctrine of strict liability in tort in order to relieve plaintiffs of the burden of proving specific acts of negligence by permitting negligence to be implied where plaintiffs can prove a product is defective and unreasonably dangerous when placed in the stream of commerce. While the "equity" of shifting the risk of loss to those better able to bear it financially was a policy consideration, it was neither the sole nor the predominant factor. It is clear from our decisions that inherent in our recognition of strict products liability is the concept that sellers who place defective and unreasonably dangerous products on the market are at fault when a user is injured by that activity and should bear responsibility. A corporate successor is not a seller and bears no blame in bringing the product and the user together. It seems patently unfair to require such a party to bear the cost of unassumed and uncontemplated products liability claims primarily because it is still in business and is perceived as a "deep pocket." [2]

---

**2.** In this case, no allegation has been made that Nissen knew or should have known of potential tort liability at the time it purchased American Tredex's assets. Therefore, we need not address the question whether a successor, which knew at the time of asset purchase that there were product liability claims against the predecessor, may be held liable for those claims. We note, however, that the fourth exception, where the transaction was entered into fraudulently to escape liability, may cover such a situation. Also, an interesting alternative to the continuity of enterprise theory has been suggested that may be applicable in such cases. That approach would apply the "bona fide purchaser" rules of property where a corporate successor is sued for its predecessor's products liability. Under that theory, a corporate successor would be

"liable for defective products of its predecessor ... if it knew or should have known of those defective products. Under this rule,

Respondent Atlantic argues that, because Nissen reaped the benefits of the goodwill of American Tredex, it would be unfair to permit it to escape the burden of paying American Tredex's tort liabilities. This argument lacks merit. It overlooks the fact that, if American Tredex products do cause injuries, Nissen will suffer a resultant loss in the value of the goodwill it purchased.

Although Brandt contends that we should "not allow a major corporation to purchase only the benefits in an asset purchase transaction while denying its attendant liabilities to the consuming public," he overlooks the fact that the remedy he seeks for this "injustice" may be unfairly broad. Were we to adopt continuity of enterprise, not only would liability be imposed upon "a major corporation," but it would also be imposed upon the small business operation which may not be in a position to spread the risk or insure against it. As the Third Circuit explained in *Polius,*

> "That a corporation the size of General Motors may be able to spread the cost of § 402A among its millions of customers does not mean that a machine shop employing five or ten individuals has similar capabilities. And General Motors' ability to self-insure if no liability policies are available does not aid the machine shop when its premium for a policy (assuming it can get one) rises to confiscatory heights." (Footnote omitted.)

802 F.2d at 81.

■ Brandt also complains that he was not "alerted to internal corporate changes which would prevent the protec-

---

corporations may no longer manipulate the form of their corporate acquisitions in an attempt to avoid the predecessor's potential strict products liability. This may put a damper on some corporate acquisitions. However, the rule is consistent with general corporate law policies which seek to protect the successor corporations from unknown liabilities in order to promote free alienability and stable predictability in corporate acquisitions, since under the rule there is liability only for known liabilities." (Footnote omitted.)

Comment, *A Policy Analysis of a Successor Corporation's Liability for Its Predecessor's Defective Products When the Successor Has Acquired the Predecessor's Assets for Cash,* 71 Marquette L.Rev. 815, 848–49 (1988).

tion properly due to a consumer of a product." We cannot accept the proposition implied by this argument that consumers retain products in reliance upon their ability to sue a certain entity if a problem develops with the product. Brandt was notified of the sale of American Tredex. Had he realized that he would not be able to sue the successor if he was injured, we doubt that he would have scrapped his treadmill and purchased a new one. Nissen did more than was required of it by providing the needed replacement parts at Brandt's request. The fact that Nissen maintained a network to service American Tredex customers and, in fact, furnished parts to Brandt for his treadmill does not give rise to successor liability.[3] Furthermore, we should not penalize Nissen for retaining a few of American Tredex's employees or for assuming some of American Tredex's commitments. All of these actions on Nissen's part have important societal value. While we recognize the societal value of permitting consumers to recover from those responsible when they are injured by a product, Nissen is not one of those responsible for Brandt's injuries.

The *Restatement (Second) of Torts* § 402A, upon which Maryland strict liability in tort law is based, *Phipps*, 278 Md. at 353, 363 A.2d at 963, does not contemplate imposition of liability upon successor corporations. *See Giraldi*, 687

---

3. Even though a corporation may not be liable as a corporate successor, we note that several courts, which otherwise adhere to the traditional rule of nonliability of successor corporations, have held that "[a] successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention. This is so despite the nature of the transfer." 1 L. Frumer & M. Friedman, *Products Liability* § 2.06[5], at 2–195 (1960, rev. 1989). For example, "[i]n *Shane v. Hobam* [332 F.Supp. 526 (E.D.Pa.1971) ] a federal district court held that a purchaser of assets may acquire a duty to warn its predecessor's customers if it profits from the predecessor's good will, represents itself as the same enterprise, undertakes certain positive responsibilities of the predecessor such as servicing, and has actual or constructive knowledge of the existence of a defect." *Id.* (footnote omitted). Neither Brandt nor Atlantic has alleged that Nissen had any knowledge of, or independent duty to warn of, a defect in the treadmill.

F.Supp. at 991. As was noted by the Third Circuit in *Polius,*

"[T]he Restatement reaffirms the notion of a causal relationship between the defendant's acts and the plaintiff's injury—a concept that is fundamental to tort law. The corporate successor theories espoused by Michigan and California brush aside this bedrock requirement and impose liability on entities which in fact had no connection with the acts causing injury.

Even the wholesaler or retailer who sells a defective product has some causal connection with the plaintiff's injury. The same cannot be said of the owner of a new business who manufactures an improved, defect-free, version of a product in a facility purchased from his predecessor. . . .

Under the continuity of enterprise theory, a new owner who continues his predecessor's operations may be liable if he manufactures some but not all of a number of items. If the new owner continues to manufacture ten items but decides not to produce one because it is too dangerous, he might nevertheless be liable for claims which his predecessor set in motion through the dangerous product." (Footnote omitted.)

802 F.2d at 81–82. The *Polius* court concluded that "the continuity of enterprise theory ... proposes an ill-considered extension of liability to an entity having no causal relationship with the harm." *Id.* at 82.

The status of acceptance of the continuity of enterprise doctrine has been reported as follows:

"The continuity of enterprise exception to the general rule of successor nonliability has been adopted or treated as valid under the law of Alabama, Maryland [citing the Court of Special Appeals decision in the instant case], Michigan, Mississippi, and Ohio. . . .

The status of the continuity of enterprise exception has been a matter of uncertainty in ... New York, ... New Hampshire ... [and] South Carolina. . . ." (Footnotes omitted.)

1 *American Law of Products Liability 3d, supra,* § 7:22, at 38–39. A brief review of the handful of cases relied on by Respondents to support the continuity of enterprise doctrine may be helpful.

*Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145 (1st Cir.1974), was one of the first cases to grapple with the problem of successor corporate liability for injuries caused by defective products of a predecessor. The predecessor in *Cyr* was not a corporation, it was a sole proprietorship owned by Bernard Offen. Upon the death of the proprietor, the assets of Bernard Offen doing business as B. Offen Company were purchased by a group comprised of the employees of Bernard Offen and one outside financier. The business operation continued unchanged. The First Circuit, applying New Hampshire law, held that the successor could be liable for injuries caused by a product manufactured by its predecessor. The court reasoned that

> "a corporation itself cannot act. It can conduct its business only through its officers and employees. The negligence of employees in carrying out that business is the responsibility of the corporate body. If as a group the same employees continue, without pause to produce the same products in the same plant, with the same supervision, the ownership of the entity which maintains essentially the same name cannot be the sole controlling determinant of liability."

*Id.* at 1154. Although the successor was not a continuation of the entity of the predecessor under traditional analysis, the *Cyr* court apparently justified imposition of liability on the successor because it was owned by the employees of the predecessor. The court found a nexus between the owners of the successor corporation and those responsible for plaintiffs' injuries—the employees.

The leading case adopting the continuity of enterprise doctrine is *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976), a 3–2 decision involving a worker who suffered amputation of both hands as a result of a power press injury. The *Turner* majority refused to differ-

entiate between a merger, a *de facto* merger, and a sale of assets for cash in the context of a products liability case. The court reasoned, "Products liability law is a fast-developing area. All the rules have not yet been formulated and products liability law, as it matures, has to shake off various impediments associated with traditional concepts, which, while relevant to other problems, are inappropriate for this new area." *Id.* 244 N.W.2d 873 at 877. Based on this nebulous rationale, the court determined that if products liability survived in a merger or *de facto* merger, it should also survive in a cash purchase of assets where the business operation continued uninterrupted. We do not agree that traditional rules of successor liability should be "shaken off" as "impediments." *Id.*

In *Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781 (Ala.1979), the plaintiff had his right arm amputated after it was caught and pulled into a meat grinder. The meat grinder was manufactured by a corporation that later sold all of its assets to a successor. In that case, the Supreme Court of Alabama found the reasoning of *Turner* "persuasive" and stated that, where there was a continuity of enterprise, the successor corporation could be "estopped from denying liability to innocent third parties." *Id.* at 786. Nevertheless, it affirmed summary judgment in favor of the successor corporation because plaintiff's complaint "g[ave] the defendant no notice whatsoever that it [was] to be held liable as the successor of the corporation that actually manufactured the meat grinder." *Id.* at 786.[4]

*Holloway v. John E. Smith's Sons Co., Div. of Hobam*, 432 F.Supp. 454 (D.S.C.1977), another meat grinder case, is likewise unconvincing. In *Holloway*, the United States District Court for the District of South Carolina followed *Cyr* and held that the successor corporation could be liable

---

**4.** Similarly, we note that the complaint in the case at bar fails to notify Nissen that it is being sued in its capacity as successor to American Tredex. Since we are affirming the entry of summary judgment in Nissen's favor, we need not address this issue.

primarily because the successor corporation "continued at its same address with virtually all of its previous employees." *Id.* at 456.

Respondents also cite *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir.1985), which applied Mississippi law, to support their argument that we should expand the continuity of entity exception to include continuity of enterprise. Although *Mozingo* states that the trial judge did not err in sending the continuity of enterprise issue to the jury, the court's reasoning illustrates that the successor corporation in that case was a continuity of entity, in the traditional sense, of the predecessor. The court found that "[t]here was a substantial degree of identity of stockholders, and identity of stock in the sense that the [predecessor's] stock was simply converted to [the successor's] stock." *Id.* at 176. There was no reason to expand the traditional mere continuation exception to encompass the continuity of enterprise theory in that case because a continuity of entity could be found.

Respondents' reliance on *Bonee v. L & M Const. Chemicals*, 518 F.Supp. 375 (M.D.Tenn.1981) (applying Ohio law), is also unpersuasive. The *Bonee* court's decision was based on its interpretation of prior Ohio corporate successor liability cases which "look through form to substance" in order "to protect the rights of third parties." *Id.* at 380. Stating that "[t]he Ohio courts have recognized the strict liability policy of spreading the risk of loss to all consumers of a product so that the product will bear the social and individual costs of its own defects," *id.*, at 381, the federal court concluded, "In order to give effect to that policy, the Ohio courts would look through form to substance and attach liability to a successor corporation that continued the business operation or enterprise of the predecessor if the predecessor was rendered effectively liquidated by the sale of assets." *Id.* A careful reading of the "look through form to substance" cases cited in *Bonee* indicates, however, that Ohio applies the traditional exceptions to the rule of nonliability of a corporate successor. Furthermore, since *Bonee*,

the Supreme Court of Ohio has spoken on the issue of corporate successor liability in a products liability context. In *Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St.3d 60, 507 N.E.2d 331 (1987), the court rejected the product line theory. *See supra* note 1. In discussing the traditional continuity of entity exception, the court described without adopting what it termed "the expanded view of continuity," but found that view inapplicable under the facts before it. *Id.* 507 N.E.2d at 336. The ultimate holding in *Flaugher* indicates that Ohio would probably adhere to the traditional rule in products liability cases:

"[W]e hold that a corporation which purchases the assets of a manufacturer is not liable for injury resulting from a defective machine produced by that manufacturer unless there is an express or implied assumption of such liability, or the transaction constituting the sale of assets amounts to a *de facto* merger or consolidation, or the purchaser corporation is a mere continuation of the seller corporation, or the transaction is a fraudulent attempt to escape liability."

*Id.*

*Salvati v. Blaw-Knox Food & Chemical Equip.*, 130 Misc.2d 626, 497 N.Y.S.2d 242 (N.Y.Sup.Ct.1985), is cited by Respondents for the proposition that New York has adopted the continuity of enterprise theory. In fact, New York authority appears to be split on this question. *Santa Maria v. Owens-Illinois, Inc.*, 808 F.2d 848, 858 n. 11 (1st Cir.1986) (applying New York law); *Diaz v. South Bend Lathe Inc.*, 707 F.Supp. 97, 102–03 n. 1 (E.D.N.Y.1989). In *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983), the New York Court of Appeals stated, "We do not adopt the rule of either [the continuity of enterprise or product line theory, *see supra* note 1] but note that both are factually distinguishable in any event." *Id.* 464 N.Y.S.2d at 440, 451 N.E.2d at 198. While in *Salvati* the Queens County Supreme Court interpreted *Schumacher* as leaving open the question of whether New York would adopt the continuity of enterprise

theory, 497 N.Y.S.2d at 245–46, the Monroe County Supreme Court stated that the *Schumacher* court "refused to adopt either rule." *Radziul v. Hooper, Inc.*, 125 Misc.2d 362, 479 N.Y.S.2d 324, 326 (N.Y.Sup.Ct.1984). Under these circumstances, *Salvati* is not persuasive.

Based on our examination of the decisions of our sister states adopting the continuity of enterprise theory, we fail to find a compelling reason to deviate from the traditional corporate successor liability rule.[5]

■ For the reasons set forth in this opinion, we reject the continuity of enterprise theory of successor corporate liability. Like the majority of our sister states, we adhere to the general rule of nonliability of successor corporations, with its four traditional exceptions, in products liability cases. *E.g., Florom v. Elliott Mfg.*, 867 F.2d 570 (10th Cir.1989) (applying Colorado law); *Conn v. Fales Div. of Mathewson Corp.*, 835 F.2d 145 (6th Cir.1987) (applying Kentucky law); *Tucker v. Paxson Machine Co.*, 645 F.2d 620 (8th Cir.1981) (applying Missouri law); *Swayze v. A.O. Smith Corp.*, 694 F.Supp. 619 (E.D.Ark.1988) (applying Arkansas law); *Bernard v. Kee Mfg. Co., Inc.*, 409 So.2d 1047 (Fla.1982); *Green v. Firestone Tire & Rubber Co., Inc.*, 122 Ill.App.3d 204, 77 Ill.Dec. 591, 460 N.E.2d 895 (1984); *DeLapp v. Xtraman, Inc.*, 417 N.W.2d 219 (Iowa

---

5. We note that there is no guidance on this issue in the Consumer Product Safety Act, Pub.L. No. 92–573, 86 Stat. 1207 (1972) (codified as amended at 15 U.S.C. §§ 2051–2083 (1982)). One of the stated purposes of this act is "to protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). The act imposes certain requirements upon manufacturers, distributors, retailers, and in some cases labelers, such as certifying that a product complies with applicable consumer product safety standards, § 2063; reporting substantial hazardous product defects to the Product Safety Commission, § 2064(b); notifying the public and persons to whom a product was delivered or sold of substantial product hazard, § 2064(c); repairing, replacing or refunding purchase price of products presenting substantial product hazard, § 2064(d); and record keeping to permit implementation of the act, § 2065. Although the act defines the terms "manufacturer," "distributor," "retailer," and "private labeler," no mention is made of corporate successors. 15 U.S.C. § 2052.

1987); *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96 (Minn. 1989); *Jones v. Johnson Mach. & Press Co., Etc.*, 211 Neb. 724, 320 N.W.2d 481 (1982); *Downtowner, Inc. v. Acrometal Products, Inc.*, 347 N.W.2d 118 (N.D.1984); *Goucher v. Parmac, Inc.*, 694 P.2d 953 (Okl.App.1984), *cert. denied by unpublished order* January 23, 1985; *Hamaker v. Kenwel–Jackson Mach., Inc.*, 387 N.W.2d 515 (S.D.1986); *Ostrowski v. Hydra–Tool Corp.*, 144 Vt. 305, 479 A.2d 126 (1984); *Fish v. Amsted Industries, Inc.*, 126 Wis.2d 293, 376 N.W.2d 820 (1985).

■ In conclusion, our adoption of the cause of action for strict liability in tort does not abandon the fundamental principle that, in order to impose tort liability, there must be fault. The continuity of enterprise exception is inconsistent with Maryland law because "the basis for the continuity of enterprise exception is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." 1 *American Law of Products Liability 3d, supra,* § 7:21, at 37. Since Respondents do not contend, and the record does not disclose, that Nissen is a continuity of entity of American Tredex under one of the traditional exceptions to the rule of nonliability of successor corporations, there is no genuine dispute as to a material fact. The Circuit Court for Baltimore City did not err in granting Nissen's motion for summary judgment.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.

ELDRIDGE and HINKEL, Judges, dissenting:

We concur with the majority in the adoption of the general rule of non-liability of successor corporations, together with its four traditional exceptions. We would, however, adopt a fifth exception for "continuity of enter-

**634**

prise" with regard to defective products.   Therefore, we dissent.